NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3740-16T2

JED GOLDFARB,

      Plaintiff-Appellant/
Cross-Respondent,

v.

DAVID SOLIMINE,

      Defendant-Respondent/
Cross-Appellant.

_____

> APPROVED FOR PUBLICATION
> AS REDACTED
> June 26, 2019
>
> APPELLATE DIVISION

Argued December 5, 2018 – Decided June 26, 2019

Before Judges Koblitz, Ostrer and Mayer.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-3236-14.

Andrew M. Moskowitz argued the cause for appellant/cross-respondent (Javerbaum Wurgaft Hicks Kahn Wikstrom & Sinins, PC, attorneys; Andrew M. Moskowitz, of counsel and on the briefs).

Carmine A. Iannaccone argued the cause for respondent/cross-appellant (Epstein Becker & Green, PC, attorneys; Carmine A. Iannaccone, of counsel and on the brief; Michael D. Thompson, on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

This appeal arises out of defendant's broken promise to hire plaintiff to manage a portion of defendant's assets and those of his brother and father. Defendant and plaintiff agreed that plaintiff would receive a salary plus a percentage of investment gains. In reliance on that promise, but before receiving a confirming writing, plaintiff quit his job with an investment firm. Then, defendant reneged. After several months, plaintiff found another job. For the first year at his new employment, he earned less than the $250,000 annual base salary at the promised job, and he continued to earn less than the $400,000 average yearly compensation he alleged he earned at his prior job.

Proceeding solely on a theory of promissory estoppel, plaintiff sought reliance damages consisting of the difference between what he would have earned had he not quit his job, and what he ultimately earned after securing substitute employment. He appeals from the judgment, after a jury trial, of $237,000 minus applicable taxes. Plaintiff contends the trial court (1) improperly barred his damages expert, who opined on what plaintiff would have earned had he not quit his job; and (2) erred in limiting his damages to the difference between the promised $250,000 base salary and his actual earnings for seventeen months (after which they exceeded $250,000).

Defendant cross-appeals, contending that plaintiff's claim was legally and equitably barred by regulations under the New Jersey Securities Law that

require a written contract to provide services as an investment adviser; Financial Industry Regulatory Authority (FINRA) rules limiting registered persons from providing services outside their current employment with a member firm; and the unclean hands doctrine.

Before reaching these issues, we address plaintiff's argument that the trial judge should have recused herself upon plaintiff's pre-trial motion. Plaintiff moved for the judge's recusal after learning that a defense attorney, in an ex parte communication, sought the judge's assignment to the case, and the judge responded by specifically requesting the assignment from the presiding judge. We conclude this "judge-shopping" created an appearance of impropriety. On that basis, we vacate the trial judge's challenged rulings, but affirm the jury finding of liability. We decide de novo or as a matter of original jurisdiction that plaintiff was entitled to present evidence of his reliance damages; his expert should have been permitted to testify; and his claims were not barred by law or equity. We remand for a new trial on damages before a different judge. We turn first to the recusal motion.

I.

A.

The judge disclosed the ex parte communication in chambers, and confirmed it on the record. In summary, one of the judge's former law clerks,

who was an associate at the defense firm, contacted the judge by text to inquire if she was available to preside over the trial. The judge apparently had no prior connection to the case, which involved significant pre-trial motion practice. The former clerk identified the senior attorney at her firm who would try the case. The judge understood that the attorney liked to appear before her. The judge then spoke to the presiding judge and, relying on her seniority, secured assignment of the case.[1]

When plaintiff's counsel learned that the judge's assignment of the case resulted from an ex parte contact with defense counsel, he sought the judge's recusal. At the outset of the colloquy, the judge reproached plaintiff's counsel for relying on statements made in chambers:

> [PLAINTIFF'S COUNSEL]: Judge, you stated in chambers that you had received a text message from [defense counsel's] firm?
>
> THE COURT: No . . . I did not say that. Let me be very clear about what I said, and let us be very clear about the following; neither one of you will be in my chambers for the rest of this trial. I am appalled that what had been the bedrock of practice, that what a judge tells you in chambers stays in chambers seems no longer to be the rule. So let me be very clear about what I said and I didn't say.

---

[1] Both the trial judge and presiding judge are now retired. There is no indication in the record that the presiding judge knew that a former clerk's ex parte communication prompted the judge's request.

The judge then summarized what she had disclosed in chambers about the assignment request:

> [Defense counsel's] firm had hired a prior law clerk of mine . . . I think that was five years ago . . . I told both counsel that [she] had texted me this morning saying that [defense counsel] was waiting around for a judge and I said well I'll be in and I'd love to take the case.

In the course of the on-the-record colloquy, the judge later added that she requested the assignment from the presiding judge:

> I'll go further. I stopped in this morning and said, "You got a case around here, because I'm a senior Judge, I don't like doing car accident cases." So in some ways I get my pick. . . . Because that's what 25 years on the bench will get you.

Once informed of the trial attorney's name, the judge said she understood he preferred to try the case before her. "I got a text from a former law clerk that said [defense counsel] has a case, are you there? Yeah, he likes appearing before me."

Plaintiff's counsel argued that the ex parte contact amounted to "judge shopping, because they like you and they want you to hear the case."

The judge rejected the argument, stating that it was common practice for attorneys to inquire about a judge's availability to take their case.

> Counsel . . . do you have any idea how many lawyers stop in my chambers on a weekly basis and say, Judge where you at, are you open? No, not today. Well

when will you be open?  Probably by Wednesday if
you can get [the presiding judge] to wait that long.

The judge added that her former law clerks "do it all the time . . . hey Judge, the partner's coming, are you open?  Yeah, I'm open."  The judge concluded, "There is nothing untoward about a judge telling a lawyer, I'm going to be open . . . bring your case my way."  The judge stated that she believed attorneys sought her assignment because of her experience and her reputation, and she challenged plaintiff's counsel to cite instances of bias or favoritism.

At trial, plaintiff contended that defendant promised him a base salary of $250,000 to $275,000, plus a fifteen- to twenty-percent share of gains generated on a portfolio of $75-100 million.  Mid-trial, the judge barred plaintiff's damages expert.  The judge also limited plaintiff's form of damages. As a result, plaintiff was prevented from claiming damages equal to the difference between what he would have earned had he not quit his job in reliance on defendant's promise, and his actual earnings after defendant reneged.[2]  The court utilized the low end of the base salary for its instruction on damages.

---

[2] Plaintiff was also barred from any damages related to defendant's investment gains based on the advice plaintiff gave him before he left his prior employer. Plaintiff does not contest that ruling.  Also, he dismissed his claims for quantum meruit, based on defendant's subsequent investment gains, and for breach of contract.

The jury found that defendant made a sufficiently clear and definite promise of employment, such that a reasonable person would rely on it; defendant expected plaintiff to rely on the promise; and plaintiff quit his job in reliance on the promise of employment. It awarded damages based on the difference between his actual earnings and the base $250,000 salary defendant promised.

On appeal, plaintiff contends the court erred in denying his recusal motion. Plaintiff does not expressly ask us to reverse the judgment on the basis of this error, but he asks us to consider it in reviewing the court's challenged rulings on expert testimony and damages. In his reply brief, plaintiff further contends that the court's actions reflected actual partiality toward defendant. Defendant responds that the judge did not err in denying the recusal motion, and that the former law clerk's ex parte contact was a permissible inquiry about scheduling.

B.

In addressing the recusal issue, we are guided by several fundamental principles. Generally, recusal motions are "entrusted to the sound discretion of the judge and are subject to review for abuse of discretion." State v. McCabe, 201 N.J. 34, 45 (2010). However, we review de novo whether the judge applied the proper legal standard. Ibid.

7 <span>A-3740-16T2</span>

A judge must act in a way that "promotes public confidence in the independence, integrity and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." Code of Judicial Conduct Rule 2.1; see also In re Reddin, 221 N.J. 221, 227 (2015) (noting "the 'bedrock principle' that a judge should uphold the integrity and independence of the Judiciary" (quoting DeNike v. Cupo, 196 N.J. 502, 514 (2008))); In re Advisory Letter No. 7-11 of Supreme Court Advisory Comm. on Extrajudicial Activities, 213 N.J. 63, 75 (2013) (stating "[t]he purpose of our judicial disqualification provisions 'is to maintain public confidence in the integrity of the judicial process, which in turn depends on a belief in the impersonality of judicial decision making'" (quoting United States v. Nobel, 696 F.2d 231, 235 (3d Cir. 1982))).

"[A]n appearance of impropriety is created when a reasonable, fully informed person observing the judge's conduct would have doubts about the judge's impartiality." Code of Judicial Conduct, cmt. 3 on Rule 2.1 (2016); DeNike, 196 N.J. at 517 (enunciating the standard).[3] Judges must step aside from "proceedings in which their impartiality or the appearance of their

---

[3] This standard applies to a judge's judicial conduct. "To assess whether a judge's personal behavior creates an appearance of impropriety" the standard is: "Would an individual who observes the judge's personal conduct have a reasonable basis to doubt the judge's integrity and impartiality?" In re Reddin, 221 N.J. at 233.

impartiality might reasonably be questioned."  Code of Judicial Conduct Rule 3.17(B).  A judge must also do so if "there is any other reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so."  R. 1:12-1(g).

A movant need not show actual prejudice; "potential bias" will suffice.  State v. Marshall, 148 N.J. 89, 276 (1997) (quoting State v. Flowers, 109 N.J. Super. 309, 312 (App. Div. 1970)); see also Panitch v. Panitch, 339 N.J. Super. 63, 67 (App. Div. 2001).  "In other words, judges must avoid acting in a biased way or in a manner that may be perceived as partial."  DeNike, 196 N.J. at 514.

In particular, a judge may not "initiate or consider ex parte or other communications concerning a pending or impending proceeding."  Code of Judicial Conduct Rule. 3.8.  However, "[i]n general . . . discussions regarding scheduling . . . are not considered to constitute ex parte communications in violation of [the] rule."  Code of Judicial Conduct, cmt. 4 on Rule 3.8.

Judges may not "err on the side of caution and recuse themselves unless there is a true basis that requires disqualification."  Johnson v. Johnson, 204 N.J. 529, 551 (2010).  A judge's duty to sit where appropriate is as strong as the duty to disqualify oneself where sitting is inappropriate.  Ibid.; Hundred E. Credit Corp. v. Eric Schuster Corp., 212 N.J. Super. 350, 358 (App. Div. 1986)

("It is not only unnecessary for a judge to withdraw from a case upon a mere suggestion that he is disqualified: it is improper for him to do so unless the alleged cause of recusal is known by him to exist or is shown to be true in fact.").

Judge-shopping – an attorney's attempt to have a particular judge try his or her case – may undermine public confidence in the impartial administration of justice. See United States v. Phillips, 59 F. Supp. 2d 1178, 1180 (D. Utah 1999) (stating that a random case assignment system was designed to "prevent judge shopping by any party, thereby enhancing public confidence in the assignment process" (quoting United States v. Mavroules, 798 F. Supp. 61, 61 (D. Mass. 1992))). Judge-shopping is problematic for two reasons. First, "judge-shopping by one party can influence case outcomes in a way that is unfair to the non-shopping party. Second, judge-shopping creates a perception of partiality that undermines the legitimacy and credibility of the courts." Alex Botoman, Note, Divisional Judge-Shopping, 49 Colum. Hum. Rts. L. Rev. 297, 321 (2018). "[W]hen the public begins to believe that attorneys have the power to select judges . . . its belief in the impartiality of the judicial system is eroded." Theresa Rusnak, Related Case Rules and Judge-Shopping: A Resolvable Problem? 28 Geo. J. Legal Ethics 913, 913 (2015).

Our Supreme Court has expressed its disapproval of defendants' manipulation of the system to secure the removal of a judge they dislike.  See, e.g., State v. Dalal, 221 N.J. 601, 607-08 (2015).  It is just as damaging to the integrity of the judicial process when parties secure, without the opposition's knowledge or consent, the assignment of a judge they prefer.  When the judge affirmatively facilitates his or her selection by that one party, public confidence and the appearance of impartiality are further undermined.

C.

Applying these principles, we are persuaded that the trial judge abused her discretion in denying the recusal motion.  Contrary to Code of Judicial Conduct Rule 3.8, the judge here considered and responded to an inappropriate ex parte communication from her former law clerk.  The contact was not about scheduling, such as when the trial would occur.  It was about judicial assignment – that is, who would preside.

The prohibition of ex parte communications by attorneys does not bar "routine and customary" scheduling communications, but it "does apply to communications for the purpose of having a matter assigned to a particular court or judge."  Restatement (Third) of the Law Governing Lawyers § 113 cmt. c (Am. Law Inst. 2000).  The reason is apparent.  "The prohibition applies to communications about the merits of the cause and to communications about

11

a procedural matter the resolution of which will provide the party making the communication substantial tactical or strategic advantage." Ibid. As set forth above, judge-shopping communications, by securing a desired assignment, can affect the court's decisions and undermine public confidence in its impartiality. Just as lawyers are prohibited from making such ex parte communications, judges may not consider them.[4]

In this case, the judge's consideration of the ex parte communication, and her active participation in ensuring the case was assigned to her, compounded the usual concerns of judge-shopping and tainted the proceedings with the appearance of partiality. The source and manner of the ex parte communication – a text message from a former law clerk to the judge's cell phone – exacerbated the improper appearance that one party had exploited a prior relationship with the judge. A reasonable person, informed of these facts, would have doubts about the judge's impartiality. Therefore, it is

---

[4] We add that even in the case of scheduling matters, a court should not consider an ex parte communication if a party would gain an unfair advantage as a result; and if it does consider such a communication, the other parties should have an opportunity to respond. See Model Code of Judicial Conduct Rule 2.9(A)(1) (Am. Bar Ass'n 2011) (stating that a court may consider an ex parte non-substantive scheduling communication only if "the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result . . . and . . . makes provision promptly to notify all other parties of the substance of the ex parte communication, and gives the parties an opportunity to respond").

unnecessary to reach plaintiff's argument that the judge in fact favored defendant in the course of her rulings and conduct of the case.

The record does not disclose whether, as the trial judge contends, it is common in her vicinage for attorneys to inquire directly of judges about their availability. We withhold comment on such a practice, noting there is a significant difference between ascertaining whether a judge will be available and inquiring whether the judge would agree to preside over a particular case. See Restatement § 113 cmt. c. Exacerbating the situation here, the judge affirmatively responded to such an ex parte communication and secured the case assignment.

In sum, having created an appearance of impropriety and partiality through her response to an inappropriate ex parte communication, the judge was obliged to step aside. Code of Judicial Conduct Rule 3.17(B); R. 1:12-1(g). We turn next to the question of remedy.

D.

When a trial judge's actual or apparent impartiality "might reasonably be questioned," Code of Judicial Conduct Rule 3.17(B), and the trial judge fails to step aside, the reviewing court must fashion a remedy "to restore public confidence in the integrity and impartiality of the proceedings, to resolve the dispute in particular, and to promote generally the administration of justice."

13                                                                    A-3740-16T2

DeNike, 196 N.J. at 519. The appropriate relief depends on the facts and circumstances.[5]

In DeNike, the trial judge commenced negotiations about post-retirement employment with the plaintiff's law firm after the judge rendered a bench-trial verdict, but while substantive issues regarding the form of the judgment remained pending. The Supreme Court held that "a knowledgeable, objective observer" could reasonably conclude that the negotiations "infected all that occurred beforehand." Therefore, the Court held that the appearance of impropriety required vacating the judgment and ordering a new trial before a new judge. Id. at 518-19.

In Chandok v. Chandok, 406 N.J. Super. 595, 606-07 (App. Div. 2009), we required retrial of a matrimonial case where, two months before trial, defendant retained the judge's former law partner, with whom the judge had an earlier acrimonious relationship. We considered, but found inadequate, the option of remanding to a new judge to decide the divorce case based on the

---

[5] We are also informed by the United States Supreme Court's holding that, in determining whether to vacate a judgment for a trial judge's failure to recuse in a "proceeding in which [the judge's] impartiality might reasonably be questioned" under 28 U.S.C. § 455(a), the court should consider "the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863 (1988).

record and to reconsider the rulings that the first judge had issued after his former partner entered the case. We noted that a judge confined to reviewing the cold record would be unable to make credibility determinations essential to resolving the case. Id. at 607. For the same reason, we declined to exercise original jurisdiction and decide the case ourselves. Ibid.

However, a new trial is not invariably required to achieve the goals identified in DeNike. Unlike the defendant in DeNike, plaintiff here does not demand a complete retrial. Rather, he asks us to consider the trial judge's failure to recuse herself in the course of resolving the other issues on appeal. To promote economy in the administration of justice, we should endeavor to avoid a retrial that would further burden the party most aggrieved by the trial judge's refusal to step aside. A more surgically crafted form of relief may restore public confidence in the integrity of judicial proceedings while fairly and efficiently resolving the particular dispute.

We note that federal courts have held that a retrial is unnecessary where the appellate court's de novo review would suffice to cure any taint at the trial level. For example, in In re Continental Airlines, 981 F.2d 1450, 1463 (5th Cir. 1993), the Court of Appeals held that the trial judge's failure to recuse did not necessitate a remand on a motion for summary judgment because appellate review of the decision was de novo. "[N]othing would be gained by vacating

15                                                                      A-3740-16T2

and remanding . . . when [the appellate court] . . . utilized the same criteria as the courts below in ruling on the summary judgment issue."  Ibid.; see also In re Sch. Asbestos Litig., 977 F.2d 764, 787 (3d Cir. 1992) (stating that vacatur of summary judgment rulings would burden heavily the parties and the court "with little corresponding gain," as those rulings are "subject to plenary review upon final judgment").

On the other hand, federal courts have found it appropriate to vacate, in whole or in part, those trial decisions that it would otherwise review for an abuse of discretion, and to remand for reconsideration by a new judge.  Cont'l Airlines, 981 F.2d at 1463 (stating that "[t]he risk of injustice to the parties is much greater when a court lacks broad powers of review" because "the parties may remain subject to an order entered by a judge who has violated 28 U.S.C. 455(a), yet has not abused his discretion in entering the order"); Sch. Asbestos Litig., 977 F.2d at 787 (stating that "[d]eferential review . . . might not cure any prejudice").

We conclude that public confidence will be restored by our leaving in place the jury's findings; vacating the trial judge's rulings challenged on appeal and cross-appeal; deciding those issues de novo or in the exercise of original jurisdiction; and remanding for a new trial on damages.  In contrast to both DeNike and Chandok, the fact-finder in this case was a jury, not a judge who

16                                                                    A-3740-16T2

was so tainted by the appearance of impropriety as to require a retrial. We see no need to retry the jury's factual findings of liability – unchallenged on cross-appeal – that defendant made a sufficiently clear and definite promise of employment such that a reasonable person would rely on it; defendant expected plaintiff to rely; and plaintiff did, quitting his job. Retrial of those findings would disserve the party aggrieved by the trial judge's refusal to recuse herself, undermine public confidence in the judicial process, complicate resolution of the dispute, and burden the administration of justice. Additionally, remanding the Securities Act and FINRA issues that defendant raises on cross-appeal, which we would normally review de novo as questions of law, see Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995), would also disserve the efficient administration of justice and undermine public confidence.

Absent an abuse of discretion, we would normally defer to the trial judge's rulings on the admissibility of expert opinion, see Townsend v. Pierre, 221 N.J. 36, 52 (2015); and the applicability of the unclean hands doctrine, see Untermann v. Untermann, 19 N.J. 507, 517-18 (1955). However, that deference is inappropriate with respect to discretionary rulings tainted by the appearance of impropriety. Yet, unlike the federal courts, we need not remand such discretionary determinations to a new trial judge. Rather, we may

A-3740-16T2

exercise original jurisdiction and decide those issues.  See R. 2:10-5 (stating that "[t]he appellate court may exercise such original jurisdiction as is necessary to the complete determination of any matter on review").  The record here is sufficient to enable us to do so, and, unlike in Chandok, no essential questions of credibility impede our decision.

We recognize that original jurisdiction "should not be exercised in the absence of imperative necessity."  City of Newark v. W. Milford Twp., 9 N.J. 295, 301 (1952).  However, "it will be invoked in those situations where the sound administration of justice calls for appellate 'intervention and correction.'"  State v. Yough, 49 N.J. 587, 596 (1967) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)).  This case presents such a situation.

## II.

**[At the direction of the court, the published version of this opinion omits Part II, addressing issues pertaining to the trial court's challenged rulings on damages, expert testimony, the Securities Law, FINRA and unclean hands.  See R. 1:36-3.]**

## III.

In summary, the trial judge should have recused herself because she created an appearance of impropriety by affirmatively responding to an ex parte communication inquiring whether she would preside over the trial. Having vacated the judge's challenged rulings, we conclude plaintiff was

entitled to present claims for reliance damages, supported by his expert's opinion and unrestrained by the Securities Law, FINRA, or the unclean hands doctrine.

Reversed in part, affirmed in part, and remanded for a new trial on damages. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3740-16T2